June 12, 2019

**Supreme Court**

No. 2017-231-C.A.
(P1/14-3123AG)

State                    :

    v.                   :

Justice Andrade.        :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | | |
|---|---|---|
| State | : | |
| v. | : | |
| Justice Andrade. | : | |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** In the early hours of July 19, 2014, a gathering of young adults hanging out at 69 River Avenue in Providence came to an abrupt end when gunshots killed one of the guests, Ty-Shon Perry. After a three-week jury trial, the defendant, Justice Andrade, was convicted of first-degree murder by use of a firearm he was not licensed to carry. The defendant was ultimately sentenced to serve two consecutive terms of life in prison, as well as a consecutive ten-year sentence.

In this direct appeal, defendant asks us to consider four issues. First, defendant challenges the admission of the statements he gave to the police when he voluntarily turned himself in to their custody a few days after Perry was killed. Second, defendant asserts that his constitutional right to counsel was violated because his trial counsel maintained an actual conflict of interest throughout her representation of him. Third, defendant challenges the admission of testimonial and photographic evidence suggesting his affiliation with known Providence gangs. Fourth, defendant challenges specific portions of the instructions given to the jurors prior to their deliberation as well as the trial justice's decision not to include two specific instructions defendant had requested.

For the reasons set forth herein, we affirm the judgment of conviction.

- 1 -

# I

## Facts and Procedural History

### A

### The Shooting

Throughout the afternoon and evening of July 18, 2014, about a dozen young adults were hanging out at and around 69 River Avenue in Providence. In the moments before the gunshots started, Perry was standing next to an open front passenger door of a car parked on Allston Street—one house down from 69 River—talking to one of his cousins, LaShae Cornwell, and her friends, who were all sitting in the car.[1] Cornwell testified at trial that, while Perry was talking to her through the open car door, she noticed someone in a white T-shirt peeking out from behind a "good-sized" tree across the street and about two houses down. Despite the late hour and darkness, she stated that she had no trouble seeing that individual because of the light emanating from the street lights. Cornwell testified that she then saw this person step out from behind the tree towards the car she was sitting in and start shooting. Cornwell saw the person's face, the gun in his hand, and that he was wearing black basketball shorts. Cornwell saw Perry run from the car before she ducked down until she "stopped hearing the shots." When the shooting was over, she went inside the house at 69 River and saw Perry on the kitchen floor, bleeding. Cornwell identified defendant as the shooter to the police who responded to the scene; she knew defendant because she previously had resided a couple of houses away from him. Although she had not seen him in a couple of years, she was sure defendant was the person who had fired the gun from the area near the tree.

---

[1] Although none of the witnesses testified to the precise time of the shooting, one of the witnesses indicated that the shooting occurred after midnight and one of the detectives who responded to the scene testified that he received the call to respond to 69 River Avenue just after 2 a.m.

Several other young adults who either lived at 69 River Avenue or had been hanging out there that evening and late into the night also testified at trial. Some of these witnesses testified about their affiliation with groups or gangs. None of these witnesses identified the shooter, but some of them heard "Yo, Sheid" from the direction of the shooting immediately before the gunshots started. Rasheid Lebron, one of the young adults outside 69 River at the time of the shooting, testified that his nickname is "Sheid" but he had not heard his name called out in the moments before the shooting started. He did, however, testify that he returned fire at the direction of the shooter. Another witness also saw the initial shooting come from the direction of a tree and saw the shooter run down Allston Street, away from River Avenue, and get into a white car which then sped away.

Scott Bun, who lived one block away from 69 River Avenue on the corner of Robin and Allston Streets and had no affiliation to the young adults gathered at 69 River, testified that he had spent July 18 fishing and arrived home between 11:30 p.m. and midnight. Sometime later, he left his house to walk his dog and noticed a white car parked on the corner of Robin and Allston close to the stop sign at the corner. As he was walking down Allston, away from River, he heard gunshots, turned, saw a flash, then watched a black male in a white T-shirt and black basketball shorts run towards the white car, jump into the driver's side, and drive away fast. Bun stated that the car made a rattling noise, "like there was a big hole in the muffler."

Detectives from the Providence Police Department quickly narrowed in on defendant as the suspected shooter because Cornwell identified him as the shooter and their investigation revealed that he had driven his girlfriend's white car that evening while she worked a shift at Burger King and that her car had a loud, rattling muffler. On July 19, an arrest warrant was drawn for defendant. The defendant turned himself in to the Providence police station on July 21, 2014,

after he saw his picture on a news broadcast stating that he was wanted as a suspect in a murder investigation. An attorney he had hired the evening before met him at the station. After speaking privately with the attorney—whom he met for the first time upon arriving at the police station—for five minutes, defendant waived his *Miranda* rights and agreed to speak with Detective Stephen Sullivan. During his interrogation, defendant provided an alibi that he later admitted was not truthful.

On October 17, 2014, a grand jury returned a three-count indictment alleging defendant murdered Perry using a firearm that he was not licensed to carry, in violation of G.L. 1956 §§ 11-23-1, 11-47-3.2(b)(4), and 11-47-8(a).

**B**

**Pretrial Motions**

The defendant filed a motion to suppress the statements he made to the police during the recorded interrogation on the day he turned himself in to the custody of the Providence Police Department. The defendant argued—through new counsel—that these statements were made after an involuntary and unintelligent waiver of his Fifth and Sixth Amendment rights because the attorney he had retained to represent him at the police station provided ineffective assistance during the interrogation. At the hearing on defendant's motion, the trial justice heard testimony from defendant, the attorney who had represented him on July 21, 2014 at the police station, and from a criminal defense attorney who testified as an expert about representing criminal defendants. The trial justice denied defendant's motion to suppress in a bench decision rendered the same day as the hearing.

The defendant also filed a motion *in limine* requesting that the trial justice exclude testimony about gang affiliation and photographs of defendant in which defendant and the other

young men depicted were allegedly making gang hand signals. The trial justice considered this motion—along with other motions *in limine*—at a hearing he held over two days immediately preceding the trial. At the end of the hearing, the trial justice denied defendant's request to categorically exclude all evidence of gang affiliation and activity, but he promised to provide a cautionary instruction to the jury about the context in which it could consider this evidence.

## C

### The Trial

Over the course of three weeks in January 2017, a jury heard testimony from several individuals who had been present at the gathering on July 19, 2014, several members of law enforcement regarding the investigation that followed the shooting, and several witnesses who served time with defendant at the Adult Correctional Institutions (ACI). On January 25, 2017, the jury returned guilty verdicts on all three charges in the indictment: first-degree murder, discharging a firearm during the commission of the murder, and carrying a pistol without a license. The judgment of conviction entered on April 11, 2017, sentencing defendant to serve life in prison for the first-degree murder conviction, a consecutive term of life imprisonment for the firearm-discharge-in-the-commission-of-a-crime-of-violence conviction, and a consecutive term of ten years, three to serve and seven suspended, with probation, for carrying a firearm without a license or permit. The defendant timely appealed.

## II

## Discussion

## A

## Motion to Suppress Statements to Police

The defendant asserts that the trial justice erred by denying his pretrial motion to suppress the statements he made to the police on July 21, 2014.

## 1

## First Interrogation

At the hearing on his motion to suppress, defendant testified that, after he had seen a news broadcast stating that the police were looking for him in connection with a murder investigation, he spoke with an attorney on the evening of July 20, 2014. Over the phone, defendant told the attorney that he had been at a friend's house at 10 p.m. on July 18 and then picked up his girlfriend at Burger King at 2 a.m. The defendant and the attorney made plans to meet at the police station the next morning. When defendant arrived at the police station the next day, a detective placed handcuffs on defendant and transported him to an interview room, where he spoke with the attorney alone for approximately five minutes. The defendant testified that the attorney told him to tell the police what defendant had told the attorney about his whereabouts on July 18 into the early hours of July 19. According to defendant, it was his understanding from their conversation that he would give a statement to the police and then the attorney would get bail for him two weeks later; the promise of bail was the reason defendant agreed to give the statement.

When the attorney testified, he stated that he had spoken with defendant at least twice on the phone before meeting him at the police station on July 21. The attorney testified that he told defendant that he did not have any information from the police about the investigation and could

not therefore advise him about whether to give a statement to the police, but that defendant had been adamant with his alibi and that he had not been the shooter. The attorney further testified that he also told defendant that the police would be checking out the alibi from start to finish, using phone records, video-surveillance cameras, and a conversation with the friend with whom defendant claimed to have spent the hours in question. The attorney stated that he had not conducted his own investigation into defendant's alibi.

At the end of the suppression hearing, defendant argued that, notwithstanding the waiver of his *Miranda* rights before the first interrogation began, the ineffective assistance he received from his attorney while at the police station resulted in involuntary statements to the police and a violation of his Sixth Amendment right to effective assistance of counsel. According to defendant, the attorney should have taken the time to verify the information defendant had told him about defendant's whereabouts between 10 p.m. on July 18, 2014 and 2 a.m. on July 19, 2014 and that he should have advised him not to provide any statement to the police. The defendant contended that he was not given accurate advice or counseling by the attorney at the police station.

The trial justice denied the motion, concluding that defendant was not entitled to the Sixth Amendment's right to effective assistance of counsel during a custodial interrogation prior to the filing of official charges against him. He also found that the attorney at the police station had provided all of the advice to defendant he could, but defendant was clearly adamant about telling the police he had been at his friend's house from 10 p.m. to 2 a.m.

We ordinarily engage in a two-step analysis to review a trial justice's decision on a motion to suppress a statement on the basis that it was not voluntarily given. *State v. Bojang*, 138 A.3d 171, 178 (R.I. 2016). First, we review the trial justice's findings that are relevant to the facts around the circumstances and setting in which the statement was made. *Id.* We accept the findings

of fact unless we determine that the findings are clearly erroneous. *Id.* If we accept the findings of fact, then we apply them to a *de novo* review of the trial justice's determination of the voluntariness of the statement. *Id.* Ultimately, we will not overturn a trial justice's ruling on a motion to suppress until our independent review of the conclusions establishes that the defendant's constitutional rights were denied. *Id.*

The procedural posture in this case is a little different, however. The trial justice's denial of defendant's motion to suppress was based primarily on his conclusion of law that defendant's Sixth Amendment right to effective assistance of counsel had not yet attached because the custodial interrogation occurred before formal charges had been filed against defendant. This issue presents a pure question of law; therefore we review it *de novo*. *See State v. Cahill*, 196 A.3d 744, 756 (R.I. 2018).

There is no doubt that "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970); *Page v. State*, 995 A.2d 934, 938 n.7 (R.I. 2010) (same). "[A] person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated * * *." *Kirby v. Illinois*, 406 U.S. 682, 688 (1972). In Rhode Island, "the starting point of our whole system of adversary criminal justice [is] a formal charge"; "a formal accusation of a felony offense must be by way of indictment by a grand jury or by information of the Attorney General." *State v. Greenberg*, 951 A.2d 481, 495 (R.I. 2008) (brackets omitted) (first quoting *Kirby*, 406 U.S. at 689, then quoting *State v. Jennings*, 944 A.2d 171, 174 (R.I. 2008)).[2] At that time, "the accused has been informed of a formal

---

[2] As the United States Supreme Court explained a few decades ago:

accusation against him and restrictions are imposed on his liberty." *State v. Oliveira*, 961 A.2d 299, 308 (R.I. 2008) (citing *Rothgery v. Gillespie County, Texas*, 554 U.S. 191, 194 (2008)). The stage of an investigation when a suspect is "arrested and subjected to interrogation * * * is not considered to be a formal adversarial proceeding," so statements made during the interrogation cannot be "obtained in violation of [the] Sixth Amendment right to counsel." *State v. Baton*, 488 A.2d 696, 703 (R.I. 1985). The statements defendant sought to have suppressed were made before his Sixth Amendment right to counsel attached, therefore his argument regarding his Sixth Amendment right to effective counsel lacks merit.

We also note that defendant predicates his Sixth Amendment argument on *Escobedo v. Illinois*, 378 U.S. 478 (1964). In *Escobedo*, the United States Supreme Court found a violation of a Sixth Amendment right to counsel when the police questioned an uncharged suspect without warning him of his right to remain silent. *Escobedo*, 378 U.S. at 490-91. The rationale undergirding *Escobedo* in the context of custodial interrogations, however, was largely supplanted by the Fifth Amendment analysis enunciated by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966). *See Miranda*, 384 U.S. at 465-66; *see also Kirby*, 406 U.S. at 689. Moreover, in *Kirby*, the Supreme Court drew a distinction with *Escobedo*, noting that "the Court in retrospect

---

"The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." *Kirby v. Illinois*, 406 U.S. 682, 689-90 (1972).

perceived that the 'prime purpose' of *Escobedo* was not to vindicate the constitutional right to counsel as such, but, like *Miranda*, 'to guarantee full effectuation of the privilege against self-incrimination.'" *Kirby*, 406 U.S. at 689 (deletion omitted) (quoting *Johnson v. New Jersey*, 384 U.S. 719, 729 (1966)).

As the trial justice in the present case cogently observed: "'The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion.' The suspect is entitled to counsel in order to prevent the police from coercing a statement and not to prevent a defendant from speaking voluntarily. In other words, the purpose of counsel is to ensure that there is no overreaching or compulsion by the inquiring officers." (Quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)). The Supreme Court has also been clear that courts are not expected to be able to "divine a defendant's motivation for speaking or acting as he did even though there [has been] no claim that governmental conduct coerced his decision." *Connelly*, 479 U.S. at 165-66.

In the case under review, defendant voluntarily presented himself at the police station, where he met his attorney and spoke with him for five minutes outside the presence of any law enforcement agent. The defendant acknowledged that he had been "*Miranda*'d" and that he did not have any difficulty understanding what that meant. As the Supreme Court noted in *Connelly*, one of the underlying purposes of the exclusionary rule is to "substantially deter future violations of the Constitution." *Connelly*, 479 U.S. at 166. Here, defendant's Fifth Amendment rights were not violated and suppression of the statements he made during the first interrogation would not effectuate this purpose of the exclusionary rule. Therefore, the trial justice did not err by denying defendant's motion to suppress the statements from the first interrogation.

## 2

### Second Interrogation

The defendant also argues that the trial justice should have suppressed the statements he made in the second recorded interrogation on July 21, 2014. A few hours after the first interrogation—and after defendant's attorney had left the police station—Det. Sullivan initiated another conversation with defendant. The statements defendant made during this second interrogation were not explicitly identified as part of the motion to suppress, and defendant did not raise any specific objection to the admission of these statements during Det. Sullivan's trial testimony. In fact, the trial transcript indicates that defendant's trial counsel wanted the transcript of the second interrogation to be entered into evidence if the first transcript was entered over her objection.

"The raise-or-waive rule imposes upon litigants a duty to raise all their claims for relief in the trial court and properly articulate them to a judge for a ruling." *Cahill*, 196 A.3d at 753 (quoting *State v. Yon*, 161 A.3d 1118, 1128 (R.I. 2017)). "It is well settled that the raise-or-waive rule 'precludes us from considering at the appellate level issues not properly presented before the trial court.'" *Id.* (quoting *Yon*, 161 A.3d at 1128). The trial justice was not asked to specifically consider whether defendant's right to counsel was violated when Det. Sullivan resumed the interrogation after defendant's attorney had left the police station. The defendant's argument on appeal that the statements he made in the second interrogation should have been suppressed are therefore waived.[3]

---

[3] If defendant had not waived his arguments regarding the second interrogation, our review of the transcript created from the audio recording of this interrogation reveals that defendant's only disclosure during this brief interrogation was that he could not read a road map, so was not able to show Det. Sullivan the route he had driven around Providence the night of the shooting.

**B**

**Trial Errors**

**1**

**Trial Counsel's Conflict of Interest**

The defendant argues that his Sixth Amendment right to counsel was violated because his trial counsel had a conflict of interest throughout the trial. The source of the conflict, according to defendant, is that his trial counsel simultaneously represented another defendant[4] whose child's mother—LaShae Cornwell—testified against defendant as the main eyewitness to the shooting. The defendant asserts that his trial counsel deliberately kept this information from him even though everyone involved in the case except defendant knew about her other client and the connection to defendant's case. The defendant also contends that trial counsel used the connection to frame her cross-examination strategy because the attorney tried to get Cornwell to state during trial that she was willing to testify against defendant in the hopes that the state would be more lenient toward her ex-boyfriend and father of her child at his trial. According to defendant, this was a strategy trial counsel could have developed only by using inside information she obtained from her professional relationship with her other client.

The state, for its part, argues that defendant has not articulated a conflict of interest created by trial counsel's representation of another defendant stemming from a completely unrelated shooting incident. As a result, the state contends, defendant has failed to show an actual conflict of interest, "much less one that adversely affected his attorney's performance."

---

[4] This other defendant was Michael Stokes, who was convicted for crimes related to shooting several individuals in a bar. *See State v. Stokes*, 200 A.3d 144 (R.I. 2019). There is no indication that there was any connection between the shooting incident in *Stokes* and the shooting incident in this case.

Although defendant frames his conflict-of-interest argument as a "violation of his Fifth and Sixth Amendment rights pursuant to the United States Constitution and [a]rticle I, section[s] 10 and 13 of the Rhode Island Constitution," his argument clearly implicates only his right to effective assistance of trial counsel. We first note that his claim is properly cognizable in an application for postconviction relief rather than on direct appeal. "This Court repeatedly has held that it will not consider a claim of ineffectiveness of counsel that is raised for the first time on a direct appeal." *State v. Brouillard*, 745 A.2d 759, 768 (R.I. 2000). Moreover, defendant's claim lacks merit.

This Court employs a specific framework to determine whether a defendant's Sixth Amendment right to effective assistance of counsel has been infringed when a defendant asserts that his attorney had a conflict of interest during his representation. *Simpson v. State*, 769 A.2d 1257, 1266 (R.I. 2001). "[The] mere possibility of a conflict of interest is not enough to impugn a criminal conviction under the Sixth Amendment." *Chapdelaine v. State*, 32 A.3d 937, 946 (R.I. 2011) (deletion omitted) (quoting *Simpson*, 769 A.2d at 1266-67). When a defendant does not raise the conflict issue during the trial court's proceedings, we require defendant to demonstrate on appeal that the trial attorney "actively represented conflicting interests and that an actual conflict of interest adversely affected [the] lawyer's performance." *Simpson*, 769 A.2d at 1267 (quoting *Strickland*, 466 U.S. at 692; *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)). "An 'actual' conflict of interest is defined as 'one that requires that an attorney struggle to serve two masters.'" *Chapdelaine*, 32 A.3d at 946 (quoting *Simpson*, 769 A.2d at 1267). "To determine whether an actual conflict exists, the Court must look to 'whether the attorney's actions were motivated by divided loyalties and whether the attorney's conduct lacked a sound strategic basis.'" *Id.* (quoting *Simpson*, 769 A.2d at 1267).

This issue tends to arise when one attorney represents codefendants in the same trial, not when one attorney is representing two criminal defendants in completely separate prosecutions of unrelated events. *See Holloway v. Arkansas*, 435 U.S. 475, 481-82 (1978). The Supreme Court has been clear that joint representation of codefendants is not a *per se* actual conflict of interest, *id.* at 482; as set forth above, there must be some indication that the attorney in question "struggle[d] to serve two masters." *Chapdelaine*, 32 A.3d at 946 (quoting *Simpson*, 769 A.2d at 1267).

In the case at bar, the only indication during trial that defendant's trial counsel also represented an individual personally connected to a witness for the state was during eyewitness Cornwell's testimony. The defendant's trial counsel asked Cornwell several questions during cross-examination about her child's father being at the ACI awaiting trial on the charges for which he had been indicted, in an effort to elicit that her motive for testifying at defendant's trial was to help the state, hoping that the state would be more lenient with the prosecution of her child's father. While trial counsel likely became aware that the state's primary eyewitness in this case was personally connected to an individual at the ACI awaiting trial only through the trial counsel's attorney-client relationship with that individual, the representation of two defendants whose charges were wholly unrelated to each other does not demonstrate that trial counsel had any divided loyalties representing both clients. The defendant has tried valiantly to show that his trial counsel had an actual conflict of interest that was exposed during Cornwell's testimony, but there is no indication that the trial counsel's representation was in any way affected by her representation of one of the state's witness's child's father. There was, therefore, no actual conflict of interest and no violation of defendant's Sixth Amendment rights to effective assistance of counsel in this way. *See Chapdelaine*, 32 A.3d at 946.

**2**

**Evidence of Gang Affiliation**

The defendant's motion *in limine* to exclude testimony about alleged gang involvement and photographs of defendant and other young men allegedly displaying gang hand signals asserted that this evidence was not relevant to any issue in the prosecution and would serve only to "inflame the passions and prejudices of the jury." During the hearing on his motion, defendant argued that the evidence should be precluded because there is no evidence that he was a member of any gang and the photographs—taken years before the shooting—were "enormously prejudicial" with "marginal, if any, relevance to any issue in this case." The prosecutor countered that there was plenty of evidence that defendant associated with known and admitted gang members and that defendant used recognized gang hand signals in the photographs the state sought to admit into evidence. The trial justice denied the motion to categorically exclude this evidence but stated he would provide a cautionary instruction to the jury that defendant's affiliation with a gang was not an indication of bad character or a predisposition to commit a crime. On appeal, defendant argues that the trial justice erred by allowing prejudicial evidence of gang activity throughout the trial, including admitting as full exhibits four photographs of defendant and his friends making recognizable gang hand signals.

We have noted on more than one occasion that "a trial justice's rulings on motions *in limine* are preliminary in nature." *State v. Colon*, 198 A.3d 1249, 1255 (R.I. 2019). "The inherent purpose of a motion *in limine* is to prevent the proponent of potentially prejudicial matter from displaying it to the jury in any manner until the trial court has ruled upon its admissibility in the context of the trial itself." *Id.* (brackets and deletion omitted) (quoting *State v. Buchanan*, 81 A.3d 1119, 1126 (R.I. 2014)). "As such, 'an *in limine* ruling is not final and a trial justice is vested with broad

discretion to reconsider the ruling as the trial unfolds.'" *Id.* (quoting *Buchanan*, 81 A.3d at 1126). "Accordingly, it is incumbent upon counsel to raise 'timely and appropriate' evidentiary objections throughout the trial in order to preserve the issues for appeal." *Id.* (quoting *State v. Ciresi*, 45 A.3d 1201, 1212 (R.I. 2012)). In addition, "[a]ccording to our well-settled raise or waive rule, issues that were not preserved by a specific objection at trial, sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal." *State v. Hallenbeck*, 878 A.2d 992, 1018 (R.I. 2005) (quoting *State v. Bettencourt*, 723 A.2d 1101, 1107 (R.I. 1999)).

As defendant asserts in his brief, gang affiliation and activity permeated the entire trial. Both the prosecutors and defendant's trial counsel asked most of the witnesses several questions about gang affiliation and activity, if any. Moreover, four photographs were admitted into evidence through Detective Matthew McGloin, who—without any objection or renewed motion from defendant to exclude the evidence—testified about his knowledge related to street gangs that are active in Providence. In fact, in a sidebar discussion outside the presence of the jury initiated by the trial justice, defendant's trial counsel remained silent while the trial justice and the prosecutor discussed the scope of Det. McGloin's expected upcoming testimony. During Det. McGloin's testimony, defendant's trial counsel initiated a sidebar discussion to clarify which photographs the prosecutor sought to enter into evidence, and she stated a general objection to one or two of the four photographs marked for identification. She did not press or provide any foundation for her objection when the trial justice decided to allow all four photographs. Furthermore, defendant's trial counsel did not object when the prosecutor moved for the four photographs discussed with Det. McGloin to be entered as full exhibits. The blanket objection asserted at sidebar does not suffice for renewing defendant's objection to the photographs on the

bases articulated during the hearing on the motion *in limine*.[5]  The defendant's arguments regarding

the gang-related testimony and photographs are, therefore, waived.[6] *See Colon*, 198 A.3d at 1255.

## C

### Jury Instructions

The defendant requested two specific jury instructions: one about eyewitness identification

and one to assist the jurors with their assessment of the credibility of the cooperating witnesses.

The trial justice declined to include either of the two instructions in the final jury instructions but

noted defendant's objection to his decision, thereby preserving the issue for appellate review, if

needed.  On appeal, defendant mentions these requested jury instructions but fails to provide any

accompanying argument or indication as to how or why defendant thinks the trial justice erred by

refusing to give these two instructions.  As a result, defendant has waived this jury instruction issue

for our review by "simply stating [this] issue for appellate review, without a meaningful discussion

thereof or legal briefing of the issues * * *." *State v. Patino*, 93 A.3d 40, 58 (R.I. 2014) (brackets

omitted) (quoting *State v. Chase*, 9 A.3d 1248, 1256 (R.I. 2010)); *see State v. Florez*, 138 A.3d

789, 798 n.10 (R.I. 2016) ("It is not enough merely to mention a possible argument in the most

---

[5] We also note that, had this issue been preserved, the photographs of defendant were probative evidence of motive for the murder. *See State v. Young*, 78 A.3d 787, 793 n.7 (R.I. 2013).

[6] The defendant also argues—for the first time on appeal—that the trial justice erred by admitting the photographs because the state had not established any foundation for when and where the photos were taken.  This argument is waived for failure to raise it below. *See State v. Hallenbeck*, 878 A.2d 992, 1018 (R.I. 2005) ("[T]his [C]ourt will not review objections that were not raised at trial.  Consequently, allegations of error committed at trial are considered waived if they were not effectively raised at trial, despite their articulation at the appellate level.") (deletion omitted) (quoting *State v. Bettencourt*, 723 A.2d 1101, 1107-08 (R.I. 1999)).

skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

The defendant does argue, however, that the trial justice erred in three ways with the jury instructions issued to the jurors prior to their deliberation, including (1) that the limiting instruction the trial justice provided regarding the testimony about gang affiliation and activity was ineffective; (2) that the definition of "beyond a reasonable doubt" was wrong; and (3) that the instruction as to assessing the credibility of all of the witnesses was confusing. Rule 30 of the Superior Court Rules of Criminal Procedure is crystal clear, however, that "[n]o party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." The defendant did not raise any of these alleged errors to the trial justice either before or after the trial justice charged the jury with the instructions proposed and discussed at the conclusion of the evidence, even when he was provided an express opportunity to do so. The defendant has therefore also waived direct appellate review of these jury instructions.

**III**

**Conclusion**

For the reasons stated herein, the judgment of conviction is affirmed. The record of this case shall be returned to the Superior Court.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Justice Andrade. |
| **Case Number** | No. 2017-231-C.A. (P1/14-3123AG) |
| **Date Opinion Filed** | June 12, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State: <br><br> Virginia M. McGinn <br> Department of Attorney General |
| | For Defendant: <br><br> Richard K. Corley, Esq. |